### UNITED STATES DISTRICT COURT
### SOUTHERN DISTRICT OF NEW YORK

| | |
|---|---|
| ACCESS BUSINESS GROUP INTERNATIONAL LLC, <br><br> Plaintiff, <br><br> vs. <br><br> AQUA BIO TECHNOLOGY ASA & RESTORSEA, LLC, <br><br> Defendants. | Case No. _____ |

## COMPLAINT

Plaintiff Access Business Group International LLC ("Access"), by and through counsel, alleges the following in support of its Complaint against Defendants Aqua Bio Technology ASA ("ABT") and Restorsea, LLC ("Restorsea"):

## INTRODUCTION

1.      This is an action to enforce an agreement entered into between Access and ABT and to hold ABT and Restorsea accountable for their joint efforts to exclude Access from purchasing a unique material used in skincare products.

2.      Access and its affiliates operate a direct-sales business through a worldwide network of independent distributors known as "IBOs" (or "ABOs" in some areas), which sell Amway-branded products directly to consumers.  Solely for convenience, the term "Access" is used in this complaint to refer to Access and its affiliates engaged in this business with the IBOs.

3.      In 2012, Access and ABT entered into an Exclusivity Agreement, through which ABT committed to supply Access with a form of hydrolyzed roe known as AquaBeautine XL, or "Red Caviar Concentrate," which is an ingredient used in certain skincare products.

4.     Red Caviar Concentrate is a unique material made from the hatching fluid of salmon eggs, and it is harvested in Norway without harming salmon in the process.

5.     The exfoliating properties of salmon hatchery fluid were discovered as hatchery workers immersed their hands in the nutrient-rich water each day – their skin appeared smooth, wrinkle-free, and even in pallor.

6.     Between 2008 and 2012, ABT and Access worked together to test the effect of the material that came to be known as Red Caviar Concentrate.  The trial was funded substantially by Access and conducted by Access, and the results were impressive.

7.     Based on the results of the trial, Access exercised an option to purchase an ongoing supply of Red Caviar Concentrate from ABT.

8.     In particular, in February 2012, Access entered into an exclusivity agreement with ABT (the "Exclusivity Agreement"), which gave Access and its affiliates exclusive worldwide rights to market and sell skincare products containing Red Caviar Concentrate through their network of IBOs, referred to in the Exclusivity Agreement as the "Direct Sales Channel."

9.     Having secured a supply of this unique ingredient, Access developed and launched an entire line of premium skincare products with Red Caviar Concentrate as the key ingredient.  These products are branded as "Amway Artistry Youth Xtend Ultra."

10.     Red Caviar Concentrate is the key ingredient in the Youth Xtend Ultra line of products, which are designed to combat the more advanced signs of aging, such as loss of elasticity and firmness.

11.     Youth Xtend Ultra is one of the premier Amway-branded product lines, and the products have been very well received by consumers since their release in 2013.  Access projects

2

sales of more than $40 million in 2016.  Youth Xtend Ultra products are not currently sold in North America.

12.    The Exclusivity Agreement between Access and ABT expired on January 1, 2016, in the midst of negotiations between Access and ABT to renew the agreement.

13.    Even if its exclusivity rights have expired, Access has a contractual right to continue purchasing Red Caviar Concentrate.  That right is set forth in Section 10(e) of the Exclusivity Agreement.

14.    In early 2016, Access attempted to order Red Caviar Concentrate from ABT's U.S. distributor, Presperse Corp. ("Presperse"), which is based in New Jersey.

15.    Although the Exclusivity Agreement expressly allows Access to continue to purchase Red Caviar Concentrate from ABT's distributor following its expiration, ABT breached the Agreement and instructed Presperse to disregard the orders from Access, leaving a supply of Red Caviar Concentrate sitting unsold in a freezer in New Jersey, while Access's remaining supply of Red Caviar Concentrate rapidly dissipates.

16.    Upon information and belief, Restorsea is behind ABT's breach; Restorsea sells a competing line of skincare products containing Red Caviar Concentrate, and it has undertaken a years-long campaign to corner the market for Red Caviar Concentrate and to exclude Access.

17.    Upon information and belief, Restorsea purchases up to 97 percent of the Red Caviar Concentrate sold by ABT, and ABT also has granted Restorsea exclusive rights to sell products containing Red Caviar Concentrate through various avenues of commerce.

18.    Upon information and belief, Restorsea has used its power as the principal buyer of Red Caviar Concentrate to cause ABT both to breach the Exclusivity Agreement and to end

ABT's negotiations with Access to renew the Exclusivity Agreement, leaving Access without a supply of Red Caviar Concentrate and excluding Access from purchasing this unique ingredient.

19.     If Access no longer is able to purchase Red Caviar Concentrate, Access no longer will be able to sell its Youth Xtend Ultra products that contain this unique, tested, eco-friendly ingredient, causing irreparable harm to Access and to the IBOs who depend upon Access for a reliable supply of Youth Xtend Ultra products.

20.     Access brings this action to establish ABT's breach of the Exclusivity Agreement and to compel specific performance.  Damages could not begin to compensate Access and its affiliates for the irreparable harm suffered by virtue of ABT's breach.

21.     Access also seeks to hold both ABT and Restorsea accountable for violations of the antitrust laws resulting from Restorsea's exercise of monopsony power to exclude Access and their joint efforts to foreclose Access from purchasing Red Caviar Concentrate.

22.     Access further seeks to hold Restorsea accountable for tortiously interfering with the Exclusivity Agreement and with the ongoing business relationship between Access and ABT.

## PARTIES

23.     Plaintiff Access Business Group International LLC is a Michigan limited liability company with its principal place of business in Ada, Michigan.  Access participates in the business of developing and manufacturing Amway-branded skincare products.

24.     Defendant Restorsea, LLC also is a manufacturer and seller of skincare products, including products that contain Red Caviar Concentrate.  Restorsea is a Delaware limited liability company with its principal place of business in New York, New York.

4

25.     Defendant Aqua Bio Technology ASA develops and sells ingredients used in skin care products.   Upon information and belief, ABT is a Norwegian public limited liability company with its principal place of business in Bergen, Norway.

## JURISDICTION AND VENUE

26.     This Court has subject matter jurisdiction pursuant to 28 U.S.C. § 1331, because Access asserts claims that arise under the laws of the United States.

27.     This Court has personal jurisdiction over Restorsea, because Restorsea is headquartered in New York and has otherwise made and established contacts with New York that are sufficient to subject it to this Court's jurisdiction.   In addition, upon information and belief, the Restorsea conduct challenged in this lawsuit took place in New York.

28.     This Court has personal jurisdiction over ABT, because ABT has transacted business within New York, including with Access and Restorsea, and there is a substantial relationship between such transactions and this lawsuit.   In 2014, ABT appeared as a defendant in a civil case brought by Restorsea in connection with the supply of Red Caviar Concentrate and filed papers that did not challenge the personal jurisdiction of this Court (*Restorsea LLC v. Aqua Bio Technology ASA*, No. 1:14-cv-00811-ALC).   In addition, upon information and belief, ABT and Restorsea entered into an agreement to settle that litigation in New York, and their agreement has a substantial relationship to this dispute.   Further, ABT has otherwise made and established contacts with New York that are sufficient to subject it to this Court's jurisdiction.

## FACTUAL BACKGROUND

### A.     Red Caviar Concentrate

29.     As stated above, Red Caviar Concentrate is a unique material made from the hatching fluid of salmon eggs, harvested from salmon hatcheries in Norway.

30.     Red Caviar Concentrate was discovered in 1997 by Dr. Bernt Walther, an embryologist at the University of Bergen studying salmon hatching in Norway to assist the fishing industry.  Dr. Walther noticed that workers in the fish hatcheries had weathered faces but baby-soft hands.  He theorized that the slushy salmon fluid – in which the workers' hands were constantly immersed – had something to do with the condition of their skin.

31.     Studying further, he discovered an enzyme in the salmon hatching fluid.  The enzyme helps the salmon larva to "escape" the egg shell by digesting the shell's fibrous material.  He developed a method to extract the enzyme from the water after the hatching has occurred – without harming the salmon in the process.  ABT obtained rights to use the material for skincare products.

32.     In further study for human skincare applications, Dr. Walther found the enzyme helped to degrade and remove dead surface skin cells without damaging healthy skin cells underneath.

33.     An Access "Technology Scout" heard about the discovery and met with Dr. Walther in New York.  The enzyme showed promise, but Access scientists were looking for additional anti-aging effects and larger test populations.

34.     In 2008, Access and ABT entered into an agreement to begin working in cooperation to explore the restorative and anti-aging effects of the material.

35.     At the time, ABT was a small start-up company struggling to stay afloat.  Access provided ABT with the funding for trials and clinical expertise it needed to remain in business.  Access also permitted ABT to issue press releases concerning its new arrangement with Access.

36.     In 2010, Access and ABT agreed to initiate a trial of the Red Caviar Concentrate. The trial was funded substantially by Access and conducted by Access, and Access had an option to enter into an exclusive supply agreement to purchase Red Caviar Concentrate from ABT.

37.     Based on the outcome of the trial, Access exercised its option to negotiate a supply agreement. In particular, Access and ABT entered into the Exclusivity Agreement, with an effective date of February 22, 2012, granting to Access certain rights to market and sell its skincare products that contain Red Caviar Concentrate.

38.     Among other terms, Section 1(a) of the Exclusivity Agreement gave Access exclusive worldwide rights to market and sell products containing Red Caviar Concentrate through its "Direct Sales Channel."

39.     During the term of the Exclusivity Agreement, Access made $875,000 in payments, all as required by Section 3 of the Agreement.

40.     In 2012, Access began to purchase Red Caviar Concentrate from ABT. Upon information and belief, Access was ABT's first customer.

41.     In addition to its restorative qualities, Red Caviar Concentrate is eco-friendly and can be made without harming the salmon from which it is produced.

42.     ABT's Red Caviar Concentrate is a unique ingredient that Access helped develop – Access is not aware of any substitute.

**B.      Youth Xtend Ultra Product Line**

43.     Access estimates that it has invested approximately $4.3 million to develop the Youth Xtend Ultra line of products containing Red Caviar Concentrate.

44.     In 2013, Access began to produce and sell the Amway Artistry Youth Xtend Ultra line of products, which incorporated Red Caviar Concentrate as its key ingredient.

7

45.     As stated above, the Youth Xtend Ultra line of products is designed to combat the more advanced signs of aging, such as loss of elasticity and firmness.  The products work to help clear the natural repair pathways that have accumulated, making way for the skin to function more efficiently.

46.     The Youth Xtend Ultra line includes the following products:

- Youth Xtend Ultra Lifting Essence, which is described as a product that helps lift and firm skin's appearance, imparting a dramatically younger-looking newfound glow.

- Youth Xtend Ultra Lifting Crème, which is described as a product that moisturizes, leaving skin that feels soft and supple with a healthy-looking glow.

- Youth Xtend Ultra Lifting Eye Serum, which is described as a lightweight pearlescent serum giving the delicate eye area a brighter, lifted and firmer look over time.

- Youth Xtend Ultra Lifting Milky Emulsion, which is described as a product that prepares the skin to receive deep, comprehensive, anti-aging moisturization.

47.     Marketing for the Youth Xtend Ultra products emphasizes that the products contain Red Caviar Concentrate and are eco-friendly.   In particular, marketing materials emphasize that no animals were harmed in the production of the Red Caviar Concentrate.

48.     Presperse is the U.S. distributor of Red Caviar Concentrate made by ABT. Presperse is based in New Jersey, and it stores an inventory of Red Caviar Concentrate in a facility there.  Presperse is ready, willing, and able to supply the Red Caviar Concentrate to Access, once ABT approves the sale.

49.     Presperse distributes Red Caviar Concentrate to Access under the following arrangement:  Access issues a purchase order for Red Caviar Concentrate, Presperse submits a purchase order to ABT for approval to release the inventory, and ABT then ships additional Red Caviar Concentrate to Presperse to replenish its inventory.

50.     The Red Caviar Concentrate is kept frozen.  In Norway, ABT stores its enormous quantity of Red Caviar Concentrate in a storage facility in a glacier.  In New Jersey, Presperse stores its inventory in a freezer.   When Access purchases Red Caviar Concentrate from Presperse, the material is transported in a cooler pack from New Jersey to Michigan.

51.     After subjecting the Red Caviar Concentrate to quality assurance testing, Access uses it to manufacturer Youth Xtend Ultra products.  Most of these products are manufactured in Michigan and exported to distribution centers around the world.

52.     To manufacture Youth Xtend Ultra products sold in China and India, Access purchases Red Caviar Concentrate from Presperse, and then exports the material to facilities in China and India for manufacture and distribution.

**C.     Restorsea**

53.     Restorsea also sells skincare products made from Red Caviar Concentrate.

54.     Upon information and belief, Restorsea – through its CEO, Patricia Pao – has orchestrated a years-long campaign to exclude Access from purchasing Red Caviar Concentrate, and thereby to exclude Amway-branded products that contain this ingredient from the marketplace.  In particular, Restorsea has used its ever-increasing market power in the purchase of Red Caviar Concentrate to dictate to ABT the terms of ABT's ongoing relationship with Access and then to exclude Access altogether.

55.     Upon information and belief, Restorsea entered into an exclusivity agreement with ABT on March 19, 2012, after ABT entered into its own Exclusivity Agreement with Access.

56.     On September 7, 2012, ABT requested that Access amend Paragraph 1(a) of the Exclusivity Agreement between ABT and Access to modify the definition of "Direct Sales

Channel." The modification proposed by ABT was never included in any executed amendment to the Exclusivity Agreement.

57.     Upon information and belief, this requested amendment to the Exclusivity Agreement was to accommodate an exclusive relationship between ABT and Restorsea; indeed, ABT and Restorsea entered into an amended exclusivity agreement the very next day, on September 8, 2012.

58.     On February 7, 2014, Restorsea sued ABT in this Court, alleging that ABT had breached its exclusivity agreement with Restorsea by supplying Red Caviar Concentrate to others (*Restorsea LLC v. Aqua Bio Technology ASA*, Case No. 1:14-cv-00811-ALC).

59.     On July 7, 2014, Restorsea abruptly dismissed its complaint with prejudice. Upon information and belief, Restorsea and ABT reached a settlement to resolve that litigation.

60.     A report in the trade press contained the following description of the settlement between Restorsea and ABT:

> And the fall-out to this whole situation? An amended supply, license, and exclusivity agreement has been signed to strengthen the partnership between the two companies involved.
>
> Under this new agreement, all financial elements remain unchanged and both parties will cover their own expenses related to the complaint filed.
>
> The new agreement will also grant Restorsea exclusivity rights not just for AquaBeautine XL, but also for the ABT ingredients Deraclarine and Beauty Propelline, as well as rights for non-medical uses to any future ingredients that may be developed from fish hatching fluids and certain future ingredients that may be developed from the hatching fluids of other animals.
>
> <u>Further sales of these ingredients by ABT to other customers have been terminated.</u>

Andrew     McDougall,     Cosmeticsdesign.com     (Jul.     16,     2014)     (available     at

http://www.cosmeticsdesign.com/Business-Financial/ABT-and-Restorsea-resolve-legal-

dispute?utm_source=copyright&utm_medium=OnSite&utm_campaign=copyright)   (emphasis added).

61.     Upon information and belief, Restorsea's lawsuit against ABT and the subsequent settlement were calculated to gain control of the supply of the unique Red Caviar Concentrate.

62.     Upon information and belief, Restorsea is now the principal buyer of Red Caviar Concentrate and purchases as much as 97 percent of the Red Caviar Concentrate sold by ABT; Access is the only other company that purchases this material for use in skincare products.

63.     Since ABT began to supply Red Caviar Concentrate to Restorsea, multiple ABT personnel, including its CEO and COO, have indicated to Access personnel that ABT needed approval from Ms. Pao, Restorsea's CEO, in advance of any new or different contractual arrangements or other dealings with Access.

64.     Upon information and belief, it was Ms. Pao and Restorsea who initially blocked ABT from shipping Red Caviar Concentrate directly to the Access production facilities in China, thereby requiring Access to incur the expense and inconvenience of purchasing the material from New Jersey, and then exporting it to China.

**D.     Expiration of the Exclusivity Agreement, Negotiations Between Access And ABT, And Restorsea's Interference**

65.     By its terms, the Exclusivity Agreement between ABT and Access was to expire by January 1, 2016.

66.     In October 2015, Access and ABT commenced negotiations to renew the Exclusivity Agreement before it expired.

67.     During these negotiations, ABT's representatives indicated that the terms of any agreement would need to be approved by Restorsea.

68.     By February 2016, the parties had agreed on price and quantity terms for the continued supply of Red Caviar Concentrate to Access on an exclusive basis. The only provision still under negotiation defined the scope of the exclusivity rights granted to Access.

69.     Based on the terms of the Exclusivity Agreement, Access expected to be able to obtain a continued supply of Red Caviar Concentrate from Presperse, even after expiration of the Exclusivity Agreement. Section 10(e) of the Exclusivity Agreement specifically so provided.

70.     This provision survives the expiration of the Exclusivity Agreement, both by its terms and expressly pursuant to Section 10(f).

71.     In addition, Section 9(c) of the Exclusivity Agreement confirms continued supply to Access from and after January 1, 2016.

72.     Thus, ABT had agreed that the expiration of the Exclusivity Agreement would not limit the ability of Access to purchase Red Caviar Concentrate from Presperse (§ 10(e)), for sales from and after January 1, 2016 (§ 9(c)).

73.     On December 29, 2015, ABT informed Access that it would not supply it with Red Caviar Concentrate until the parties had executed an amendment extending the Exclusivity Agreement. Following that communication, ABT and Access continued to negotiate renewal terms for the Exclusivity Agreement.

74.     The Exclusivity Agreement expired on January 1, 2016.

75.     On January 15, 2016, Access placed an order with Presperse for 25 kilograms of Red Caviar Concentrate. That order has not been filled.

76.     On February 2, 2016, a representative of Presperse informed Access that ABT had directed it to hold any shipments of Red Caviar Concentrate to Access until ABT and Access concluded their negotiations.

77.     In a March 2, 2016 email, counsel for ABT confirmed that Restorsea was behind ABT's initial refusal to supply Red Caviar Concentrate to Access:

> As you may know, we have been trying the last several weeks to work out an arrangement with Restorsea that would allow ABT to supply product to Amway on the terms you have requested.  However, <u>Restorsea has so far been unwilling to agree to terms that would permit these sales.</u>
>
> I know it is frustrating for you and I can assure that ABT and I have tried, through multiple channels, to obtain a pathway for this arrangement to work.  <u>ABT is, of course, willing to sell product to Amway.</u>  However, it cannot allow sales through experience centers at this time.  If such an arrangement would be acceptable, we can work to get whatever consents we need from Restorsea to allow such an arrangement, which would be largely consistent with the last draft of the proposed amendment that Adrienne sent you.  We can also continue to work to try to allow some time in the future the use of experience stores if that is desired.

(emphasis added).

78.     On March 3, 2016, Access placed another order with Presperse for 16 kilograms of Red Caviar Concentrate.  That order has not been filled.

79.     On March 7, 2016, ABT communicated, through counsel, that it would not honor the surviving terms of the Exclusivity Agreement by supplying Red Caviar Concentrate to Access:

> [ABT] has asked that I respond on its behalf to your recent communiques about Paragraph 10(e) of the February 22, 2012 agreement between it and [Access]. ABT will abide by the surviving terms of its now terminated agreement with Amway.  However, given the inability of Amway and ABT to agree on new terms of sale as per Paragraph 9(c), ABT has no obligation, contrary to Amway's suggestion, to cause or compel Presperse (or any successor) to sell Raw Material to Amway.

80.     On March 7, 2016, a Presperse employee sent the following email to Access: "As soon as we receive the ok / release from ABT I will be able to ship.  Waiting on them, ☹"

81.     On March 8, 2016, Access placed an order with Presperse for an additional 60 kilograms of Red Caviar Concentrate.  That order has not been filled.

82.     In a March 8, 2016 email, ABT's counsel stated that ABT had directed Presperse

not to use its inventory of Red Caviar Concentrate to fill any orders submitted by Access:

> As indicated in my prior email, ABT is not obligated to and will not take any action to cause or compel Presperse to sell or deliver Raw Materials to Access.
>
> I understand, as I believe Amway knows, that a stock of ABT's Raw Materials is held by Presperse on a consignment basis and that Presperse may not take any action with respect to ABT's property without ABT's consent or approval (such as an approved order). . . .

83.     Also on March 8, 2016, ABT counsel forwarded the same email to Presperse,

with the following additional message directed to Presperse:

> [P]lease see the below email that I sent to Amway.  As I understand it, there have been no orders accepted by ABT for the sales of its Raw Materials to Amway since the expiration of the Amway/ABT Agreement and, in the absence of a new Agreement with Amway, ABT is not obligated to and will not take any action (such as approving a post-termination order) to compel or cause Presperse to sell ABT's raw materials to Amway.

84.     Also on March 8, 2016, a Presperse employee sent the following email to Access:

> As we discussed, I re-issued the original PO and placed a new PO to ABT based on our conversation this morning.
>
> I received a reply from ABT's legal counsel with the email trail with your legal counsel below.  Unfortunately, we are not able to ship you any material at this time.

85.     Despite ongoing negotiations and the surviving terms of the Exclusivity

Agreement, Access has been unable to obtain any additional Red Caviar Concentrate from

Presperse and ABT.

86.     Upon information and belief, ABT has produced an enormous quantity of Red

Caviar Concentrate (approximately 40 tons), most of which is stored inside the glacier in

Norway; this quantity is more than sufficient to supply the requirements of both Access and

Restorsea for many years.

87.    Upon information and belief, a supply of Red Caviar Concentrate remains available in a freezer in the Presperse warehouse in New Jersey.

**E.    Irreparable Harm**

88.    During the term of the Exclusivity Agreement, Access has developed a substantial business of selling skincare products containing Red Caviar Concentrate.  Total worldwide sales of the Youth Xtend Ultra products totaled approximately $125 million from 2013 through 2015, and sales of this product line are projected to exceed $40 million in 2016.

89.    Access will soon run out of Youth Xtend Ultra products that contain Red Caviar Concentrate, leaving it unable to supply the IBOs with the products.

90.    In particular, Access expects to run out of Red Caviar Concentrate by the end of March 2016, forcing it to cease production of Youth Xtend Ultra products.  Access expects that its inventory of Youth Xtend Ultra products will last through June 2016.

91.    Unless Access obtains additional Red Caviar Concentrate in the immediate future (i.e., by the end of March 2016), there will be an interruption in the supply of Youth Xtend Ultra products, causing irreparable harm to Access and to IBOs, as described below.

92.    Access has investigated reformulating the Youth Xtend Ultra products to replace Red Caviar Concentrate with a different ingredient, but Red Caviar Concentrate is a unique input material, and its Research & Development department has been unable to identify a direct substitute.  There are several unique aspects of the ingredient.

93.    First, Access has been unable to identify an alternative ingredient that has the same group of proteins, polypeptides, and enzymes.

94.    Second, Access is not aware of an alternative ingredient that has been subjected to the type of trial conducted by Access and ABT.  Such trials can take as long as two years to complete.  Without testing, Access cannot ensure that a new ingredient will be effective.

15

95.    Third, Red Caviar Concentrate is eco-friendly and can be produced without harming animals (i.e., without killing the fish used to produce the ingredient).  Access is not aware of a direct replacement that is eco-friendly and can be produced without harming the fish.

96.    Fourth, Access is not aware of any direct replacement that qualifies as hydrolyzed roe.  If Access were to substitute another type of ingredient in its Youth Xtend Ultra products, it would need to work through a registration process in the many different countries around the world in which the products are sold.  On average, this process typically takes a year to complete for each country, but it could take as long as five years.

97.    Even if Access were able to locate a replacement ingredient, it would take two to three years to reformulate its products and bring them to market.  Reformulation would require Access to engage in a product development process involving numerous steps – e.g., formulation, packaging, trial, testing, registration and regulation, and supplier selection and contracting – and that process typically takes two to three years.

98.    Access and its affiliates have adopted a multi-level marketing business model. Specifically, Access and its affiliates supply products that are sold directly to customers by IBOs, and IBOs may bring others into the business.

99.    Access will suffer irreparable harm from an interruption in its ability to supply Youth Xtend Ultra products, including damage to its reputation and goodwill, if it were to abruptly cease the production and supply of a premier line of Amway-branded products:

- Any interruption in the supply of Youth Xtend Ultra products would cause an irreparable loss of market share in the sale of such products;

- Access has commitments to purchase other ingredients that are included in the Youth Xtend Ultra line of products that it would no longer be able to produce and sell, harming its relationships with other suppliers;

- Access depends on the IBOs to sell its products to consumers; certain IBOs depend on the supply of these products to support their business success, and

some undoubtedly would abandon their efforts to sell Amway-branded products, possibly moving to a competitor;

- If IBOs lose the ability to sell Youth Xtend Ultra, it could cause a decline in their sales of other products;

- When the supply of a product is disrupted, the goodwill and success of IBO initiatives built around such products – including initiatives to sell the products and to bring others into the business – are adversely affected in ways that cannot be measured in monetary terms;

- The inability to continue obtaining Red Caviar Concentrate could harm its reputation and, thus, future efforts by Access to acquire innovative and proprietary ingredient technologies from other sources; and

- The inability to continue supplying a premier line of products like Youth Xtend Ultra would cause lasting damage to the reputation of Access and its affiliates, as well as to the Amway brand.

100.    IBOs that sell the Youth Xtend Ultra line of product would suffer irreparable harm as well. IBOs that are unable to supply their customers with Youth Xtend Ultra products will lose customers and suffer damage to their customer relationships and personal reputations.

101.    When an IBO can no longer offer one of the lead products attracting consumers to its broader portfolio of Amway-branded products, it loses goodwill with regular customers and suffers reputational harm as a purveyor of a full line of products.

102.    Because IBOs are the consumer-interface for most sales of Amway-branded products, harm to the goodwill and reputation of IBOs with consumers harms the reputation of the Amway brand as well.

103.    Furthermore, harm to IBO efforts to sell products and expand the business has a direct effect on the attractiveness of the entire multi-level marketing model in the IBO community, which threatens irreparable harm to Access, its affiliates, and their business model.

104.    In short, an interruption in the supply of Youth Xtend Ultra products would have far-reaching, dramatic, and unpredictable consequences for Access, its affiliates, and the IBOs.

105.    While it is difficult to forecast demand over a two-year period, Access projects that an additional 366 kilograms of Red Caviar Concentrate is needed to meet its requirements for the next two years, and more would be needed to meet its requirements in a third year.

## CLAIMS FOR RELIEF

### COUNT I
### Breach of Contract and Specific Performance
### (Against ABT)

106.    Access repeats and alleges each and every allegation above as if fully set forth and repeated herein.

107.    Access and ABT are parties to the Exclusivity Agreement, which is a valid, binding, and enforceable contract with terms and conditions that survive its expiration.

108.    Access performed under the Exclusivity Agreement.

109.    ABT breached the Exclusivity Agreement, including by blocking Access from purchasing Red Caviar Concentrate from Presperse after ABT agreed with Access that the expiration of the Exclusivity Agreement would not limit the ability of Access to purchase Red Caviar Concentrate from Presperse (§ 10(e)) for sales from and after January 1, 2016 (§ 9(c)).

110.    Presperse is ready, willing, and able to sell Red Caviar Concentrate to Access. Upon information and belief, ABT has more than enough Red Caviar Concentrate to meet the requirements of Access, including inventory stored in a freezer in the Presperse facility in New Jersey.

111.    As a result of ABT's breach of the Exclusivity Agreement and its inability to obtain a unique input material that is a key ingredient in the Youth Xtend Ultra line of products, Access and its affiliates will suffer irreparable harm to their business, reputation, and goodwill, for which monetary damages are not adequate.

112.    An award of damages will not begin to remedy the irreparable harm to Access and its affiliates, which can only be averted by specific performance.  Nevertheless, Access has been and will be damaged by ABT's breach and, if necessary, Access will seek monetary damages in an amount to be established at trial.

## COUNT II
## Declaratory Judgment
## (Against ABT)

113.    Access repeats and alleges each and every allegation above as if fully set forth and repeated herein.

114.    There exists between Access and ABT a real, actual, substantial, and present controversy with respect to (1) the validity and enforceability of the surviving terms of the Exclusivity Agreement; and (2) the rights, liabilities, and obligations of Access and ABT under the Agreement.

115.    Access seeks to hold ABT to its obligations pursuant to Section 10(e) of the Exclusivity Agreement.

116.    ABT has refused to honor that aspect of its agreement and has blocked its distributor, Presperse, from supplying Red Caviar Concentrate to Access.

117.    Accordingly, pursuant to 28 U.S.C. §§ 2201 & 2202, Access seeks a judgment declaring that the surviving terms of the Exclusivity Agreement require ABT to make available Red Caviar Concentrate to Access through Presperse, and refrain from blocking Access from purchasing Red Caviar Concentrate from Presperse.

**COUNT III**
**Monopsonization in Violation of Section 2 of the Sherman Act**
**(against Restorsea)**

118.     Access repeats and alleges each and every allegation above as if fully set forth and repeated herein.

119.     For purposes of the antitrust claims asserted by Access under Sections 1 and 2 of the Sherman Antitrust Act (the "Sherman Act"), 15 U.S.C. §§ 1 & 2, the relevant market is a worldwide, buyer-side market (i.e., a market for an input material, not an output product) for the purchase of Red Caviar Concentrate used in skincare products (the "Relevant Market").

120.     As described above, Red Caviar Concentrate is a unique input with no acceptable substitute, because, among other things, Access has been unable to locate any other input material that (1) contains the same group of proteins, polypeptides, and enzymes, (2) has been subjected to testing and registration, and (3) is eco-friendly and can be produced without harming animals.

121.     Restorsea and ABT are the only significant buyers of the Red Caviar Concentrate made by ABT for use in skincare products.

122.     Restorsea has market power (i.e., monopsony power) as the purchaser of 97 percent of the Red Caviar Concentrate sold by ABT, a unique ingredient produced only by ABT.

123.     Restorsea willfully acquired and maintained its dominant position through a years-long campaign to corner the market for Red Caviar Concentrate, including through unlawful exclusive dealing agreements with ABT, by dictating the terms on which ABT could do business with Access, by conditioning its purchase of Red Caviar concentrate from ABT on ABT's agreement to exclude other buyers from purchasing the ingredient, and ultimately by

inducing ABT to agree to cut off the supply of Red Caviar Concentrate to Access entirely. As a result, Restorsea has completely foreclosed competition in the Relevant Market.

124.    Restorsea's conduct has violated Section 2 of the Sherman Act and harmed competition by (1) inducing ABT to cut off the supply of Red Caviar Concentrate to its only other significant customer (Access), eliminating competition in the Relevant Market that would otherwise allow ABT to set its prices at competitive levels; and (2) depriving consumers of the opportunity to purchase skincare products containing Red Caviar Concentrate from any source other than Restorsea, thereby reducing output and likely increasing prices above competitive levels in the downstream market for such products.

125.    The anticompetitive effects of Restorsea's conduct substantially outweigh any procompetitive business justifications it might advance.

126.    Restorsea's conduct has harmed and will continue to harm Access by foreclosing it from the Relevant Market, leaving it unable to produce and supply skincare products that contain this unique ingredient, causing irreparable injury to its goodwill and reputation, as well as lost profits and other damages.

## COUNT IV
### Conspiracy to Monopsonize in Violation of Section 2 of the Sherman Act
### (against ABT and Restorsea)

127.    Access repeats and alleges each and every allegation above as if fully set forth and repeated herein.

128.    As described above, ABT and Restorsea engaged in concerted action by agreeing to exclude Access from the Relevant Market for the purchase of Red Caviar Concentrate.

129.    ABT and Restorsea acted with the specific intent to allow Restorsea to monopsonize the Relevant Market and then to maintain its position as the dominant purchaser of Red Caviar Concentrate, causing an appreciable effect on commerce.

130.    In furtherance of the conspiracy, Restorsea has engaged in a years-long effort to exclude Access from competition and to corner the market for Red Caviar Concentrate, including through unlawful exclusive dealing agreements with ABT and by conditioning its purchase of Red Caviar concentrate from ABT on ABT's agreement to exclude other buyers from purchasing the ingredient; ABT has ceased supplying Access with Red Caviar Concentrate.

131.    The conspiracy between ABT and Restorsea violates Section 2 of the Sherman Act and harms competition by completely excluding Access from purchasing Red Caviar Concentrate, foreclosing all competition in the Relevant Market.   In addition, the concerted action deprives consumers of the opportunity to purchase skincare products containing Red Caviar Concentrate from any source other than Restorsea, thereby reducing output and likely increasing prices above competitive levels in the downstream market for these products.

132.    The anticompetitive effects of this conduct substantially outweigh any procompetitive business justifications that Restorsea or ABT might advance.

133.    The concerted action between ABT and Restorsea affects a substantial amount of interstate commerce, including in the Relevant Market.

134.    The concerted conduct by ABT and Restorsea has harmed and will continue to harm Access by foreclosing it from the Relevant Market for Red Caviar Concentrate, leaving it unable to produce and supply skincare products that contain this unique ingredient, causing irreparable injury to its goodwill and reputation, as well as lost profits and other damages.

**COUNT V**
**Violation of Section 1 of the Sherman Act**
**(against ABT and Restorsea)**

135.    Access repeats and alleges each and every allegation above as if fully set forth and repeated herein.

136.    As described above, ABT and Restorsea engaged in concerted action by agreeing to exclude Access from the Relevant Market for the purchase of Red Caviar Concentrate.

137.    The concerted action between ABT and Restorsea constitutes an unreasonable restraint of trade, which is unlawful under Section 1 of the Sherman Act.

138.    Under the rule of reason, the concerted action between ABT and Restorsea harms competition by completely excluding Access from purchasing Red Caviar Concentrate, eliminating competition in the Relevant Market for the purchase of Red Caviar Concentrate and also reducing the output of skincare products that contain this unique ingredient, likely increasing prices above competitive levels.

139.    The anticompetitive effects of this conduct substantially outweigh any procompetitive business justifications that Restorsea or ABT might advance.

140.    The concerted action between ABT and Restorsea affects a substantial amount of interstate commerce, including in the Relevant Market.

141.    The concerted conduct by ABT and Restorsea has harmed and will continue to harm Access by foreclosing it from the Relevant Market for Red Caviar Concentrate, leaving it unable to produce and supply skincare products that contain this unique ingredient, causing irreparable injury to its goodwill and reputation, as well as lost profits and other damages.

## COUNT VI
### Tortious Interference with Contract
### (Against Restorsea)

142.     Access repeats and alleges each and every allegation above as if fully set forth and repeated herein.

143.     Access and ABT are parties to the Exclusivity Agreement, which is a valid, binding, and enforceable contract with terms and conditions that survive its expiration.

144.     Restorsea is aware of the Exclusivity Agreement between ABT and Access.

145.     Restorsea intentionally induced ABT to breach the surviving terms of the Exclusivity Agreement by refusing to allow Access to purchase Red Caviar Concentrate.

146.     Restorsea acted with malice when it induced ABT to breach its contract with Access, including by engaging in a years-long campaign to corner the market for Red Caviar Concentrate and to exclude Access from purchasing this unique ingredient and, in turn, from producing and selling skincare products that contain Red Caviar Concentrate.

147.     Access has been and will be damaged by ABT's breach of the Exclusivity Agreement and Restorsea's interference with that Agreement.

## COUNT VII
### Tortious Interference with Business Relations
### (Against Restorsea)

148.     Access repeats and alleges each and every allegation above as if fully set forth and repeated herein.

149.     Access and ABT have an ongoing business relationship and were engaged in negotiations to renew the Exclusivity Agreement.

150.     Restorsea interfered with the negotiations between Access and ABT.

151.    Restorsea acted with the sole purpose of harming Access and used unfair or improper means, including by engaging in a years-long campaign to corner the market for Red Caviar Concentrate and to exclude Access from purchasing this unique ingredient and, in turn, from producing and selling skincare products that contain Red Caviar Concentrate.

152.    Restorsea's interference caused injury to the business relationship between Access and ABT.

153.    Access has been and will be damaged as a result of Restorsea's interference.

### PRAYER FOR RELIEF

WHEREFORE, Access respectfully requests that the Court grant the following relief:

154.    An Order to Show Cause why ABT should not be temporarily and preliminarily enjoined from blocking Access from purchasing Red Caviar Concentrate through Presperse;

155.    An order – on a temporary, preliminary, and permanent basis – compelling ABT to specifically perform on its surviving obligations under the Exclusivity Agreement, including particularly its obligation to allow Access to continue purchasing Red Caviar Concentrate through Presperse;

156.    Pursuant to 28 U.S.C. §§ 2201 & 2202, a declaratory judgment – on a temporary preliminary, and permanent basis – establishing that the surviving terms of the Exclusivity Agreement require ABT to make available Red Caviar Concentrate to Access through Presperse, and to refrain from blocking Access from purchasing Red Caviar Concentrate through Presperse;

157.    Compensatory damages suffered by Access as a result of (1) ABT's breaches of the Exclusivity Agreement and (2) Restorsea's tortious interference with the contract and business relationship between Access with ABT, in an amount to be proven at trial;

158.    Pursuant to 15 U.S.C. § 15, damages equal to treble the amount of damages sustained by Access as a result of conduct that violates Section 1 or 2 of the Sherman Act, as well as attorneys' fees and interest;

159.    Pursuant to 15 U.S.C. § 26, a permanent injunction barring ABT and Restorsea from continuing anticompetitive conduct in violation of the Sherman Act; and

160.    Costs and such other and further relief as this Court deems just and proper.

## JURY DEMAND

Access demands a trial by jury on all issues so triable in this action.

Respectfully submitted,

BRYAN CAVE LLP

By: _____

Lawrence G. Scarborough
Bieta Andemariam
1290 Avenue of the Americas
New York, NY 10104-3300
Telephone:  (212) 541-2000
Facsimile:  (212) 541-4630
lgscarborough@bryancave.com
bieta.andemariam@bryancave.com

Jacob A. Kramer (*pro hac vice* pending)
1155 F Street, N.W., Suite 700
Washington, DC  20004
Telephone:  (202) 508-6000
Facsimile:  (202) 220-7453
jakramer@bryancave.com

ATTORNEYS FOR PLAINTIFF

Dated:  March 22, 2016